## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:12CR248-1 |
| v. | ) | 1:12CR248-2 |
| | ) | |
| HOUSE OF RAEFORD FARMS, INC. | ) | |
| and GREGORY STEENBLOCK | | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on several pretrial Motions including the following:

(1) Motions to Dismiss the Indictment [Doc. #15 & #21] filed by Defendant House of Raeford

Farms, Inc. ("Defendant House of Raeford") and Defendant Gregory Steenblock ("Defendant

Steenblock"), (collectively, "Defendants"); (2) Motions for a Bill of Particulars [Doc. #24 &

#28] filed by the Defendants; (3) a Motion to Suppress [Doc. #25] filed by Defendant House

of Raeford; (4) a Motion in Limine to Prohibit Evidence of or Jury Argument Regarding the

"Responsible Corporate Officer" Doctrine [Doc. #30] filed by Defendant Steenblock; (5) a

Motion to Compel Discovery [Doc. #35] filed by the Defendants; (6) a Motion in Limine [Doc.

#33] to exclude certain evidence filed by the Government; and (7) a Joint Motion to Authorize

Use of Juror Questionnaire [Doc #26] filed by the Defendants.  The Court held a hearing on

these Motions on August 6, 2012, wherein the Court ruled from the bench on certain Motions,

and reserved ruling on others.[1]  The Court now issues the present Order to memorialize its

rulings made during the August 6, 2012, hearing.

I.    BACKGROUND

As a matter of procedure, Defendants were previously charged with fourteen (14) Counts

of violating the Clean Water Act ("the Act" or "CWA") under a Superseding Indictment in case

number 1:09CR395 ("the Prior Case").  However, by Order dated February 29, 2012, this Court

dismissed without prejudice the Superseding Indictment in the Prior Case due to a violation of

the Speedy Trial Act.  Thereafter, on June 26, 2012, the Government filed an Indictment under

case number 1:12CR248 ("the Present Case"), charging Defendants with the same 14 Counts

of violating the CWA.  As a result of this procedural posture, the parties raise some of the same

or similar arguments as were raised in the Prior Case throughout the Motions currently before

the Court. Therefore, where applicable, the Court will make reference to the Prior Case herein.

---

[1]   As noted at the hearing, the Court will grant the Government's Motion in Limine
[Doc. #33] to the extent that evidence of the prior convictions of Government witness Wilford
Washington, which are all more than ten (10) years old, shall be excluded.  In addition, the Court
will grant the Government's request to exclude evidence regarding the City's violations of its
National Pollutant Discharge Elimination System ("NPDES") permit, such that unless the
Government raises the issue of the City's violations, Defendants are excluded from introducing
evidence of such violations directly.  With regard to all other matters raised in the Government's
Motion, and as discussed more fully on the record at the hearing, the Court reserves ruling on
the Government's Motion, and will permit the parties to address any remaining issues raised
therein as such issues may arise during the course of trial.  In addition, as stated at the hearing,
the Court will deny Defendants' Joint Motion to Authorize Use of Juror Questionnaire [Doc
#26], but will consider the questions presented by Defendants for use during the voir dire.

To better understand the context of the present Motions, the Court will provide a brief overview of the statutory framework.[2] Congress enacted the CWA to restore and maintain the chemical, physical, and biological quality of the nation's waters by eliminating water pollution and protecting and ensuring the propagation of fish, aquatic life, and wildlife in the United States. See 33 U.S.C. § 1251(a). The CWA regulates the discharge of pollutants into municipal sewage treatment plants that release into United States waters. 33 U.S.C. § 1317. The municipal sewage treatment plants are known as publicly-owned treatment works ("POTWs"). 40 C.F.R. § 403.3(q).[3] The CWA prohibits the discharge of pollutants without a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§ 1311(a), 1342. Under the CWA, the United States Environmental Protection Agency ("EPA") may delegate to the states the authority to implement and enforce NPDES permits. 33 U.S.C. § 1342(b). North Carolina was delegated such authority during the times relevant herein. Under the NPDES, a POTW must establish pretreatment programs setting forth requirements for industrial users who discharge pollutants to the POTW. 33 U.S.C. § 1342(b)(8); see 40 C.F.R. § 403.3(j).[4] National standards specify the maximum levels of pollutants that can be discharged. 40 C.F.R. § 403.5. A POTW may impose substantive or procedural pretreatment requirements

---

[2] The following paragraphs within this Background section are derived, with changes where applicable, from the Memorandum Opinion and Order issued by Judge Thomas D. Schroeder in the Prior Case [Doc. #66, case number 1:09CR395].

[3] 40 C.F.R. § 403.3 was amended, effective November 14, 2005. The definition of POTW cited herein, that is section 403.3(q), was previously found at section 403.3(o) and contains identical language.

[4] The prior version of section 403.3 defined "Industrial User" in section 403.3(h) with language identical to the amended section cited herein.

on an industrial user, in addition to any national pretreatment standards, that relate to discharges to a POTW. 33 U.S.C. § 1342(b)(8); 40 C.F.R. § 403.3(t).[5] The CWA provides for criminal penalties for persons who knowingly violate any requirement imposed by an approved pretreatment program. 33 U.S.C. § 1319(c)(2)(A).

With regard to this case specifically, the Indictment alleges the following:

The City of Raeford ("the City") owns and operates a POTW in Raeford, North Carolina, pursuant to an NPDES permit issued by the North Carolina Department of Environment and Natural Resources ("DENR"). The City is permitted to discharge treated wastewater from the POTW into Rockfish Creek, a tributary of the Cape Fear River. Industrial users such as Defendant House of Raeford, which are issued permits through a POTW, are required to comply with the CWA, general pretreatment regulations, and the City's pretreatment program. See 33 U.S.C. § 1342. The City's pretreatment program, which includes a Sewer Use Ordinance ("SUO" or "Ordinance") and Industrial User Pretreatment Permits ("IUPs"), was approved by DENR on May 31, 1983.

The Indictment further alleges that around July 17, 2000, the City reissued to Defendant House of Raeford IUP No. 5161 ("IUP #5161" or "the Permit"), allowing Defendant House of Raeford to discharge pretreated wastewater from its facility to the City's POTW. Defendant House of Raeford is a North Carolina corporation that owns and operates a poultry processing plant in Raeford, North Carolina, and Defendant Steenblock was its plant manager. At all times

---

[5] The prior version of section 403.3 defined "Pretreatment requirements" in section 403.3(r) with language identical to the amended section cited herein.

4

relevant, Defendant House of Raeford slaughtered approximately 30,000 turkeys a day. The untreated wastewater generated by this processing contained numerous wastes, including feathers, blood, animal grease, fats, and anatomical parts, all of which constituted "pollutants" as defined by the Clean Water Act. 33 U.S.C. § 1362(6). The Permit issued to Defendant House of Raeford restricted discharge of pretreated wastewater to specific parameters, known as total suspended solids, biological oxygen demand, chemical oxygen demand, and acidity and caustic properties. The Permit was re-issued on July 1, 2005, and modified on June 15, 2006, but all versions prohibited discharges that bypassed Defendant House of Raeford's treatment facilities unless approved in advance. On an average day, Defendant House of Raeford generated approximately 1 million gallons of wastewater. The wastewater was processed at the plant as follows: Untreated wastewater would initially be discharged into an "offal" area, where it was to be held before proceeding into the facility's pretreatment process. From the offal area, the wastewater would be sent to a flow equalization basin ("FEB"), which was a large pit holding approximately 37,000 gallons of wastewater. The untreated wastewater would then be pumped from the FEB to two dissolved air flotation units ("DAF units"), each with a capacity of 40,000 gallons. Once in the DAF units, the water would be treated to skim grease from it and the treated wastewater would then be pumped to the City's POTW.

The Indictment alleges that on a routine and regular basis from no later than February 2005 until no earlier than August 2006, Defendants discharged thousands of gallons of untreated wastewater from the offal pit to the FEB, causing it to overflow. The Indictment also alleges that from about January 2005 until August 2006, Defendants bypassed pretreatment at

the DAF units and discharged the untreated wastewater from the FEB directly to the sewer (and thus to the POTW). The Indictment alleges that all versions of the Permit prohibit bypass of the treatment facilities except when approved in advance. Based on these allegations, each of the 14 counts in the Indictment alleges that, on the date set forth in the individual count, Defendants "knowingly discharged and caused others to discharge pollutants, namely, untreated wastewater from the House of Raeford Farms, Inc's poultry processing facility, to the Raeford POTW, in violation of a requirement of the approved pretreatment program. All in violation of [33 U.S.C. § 1319(c)(2)(A) and 18 U.S.C. § 2]."

II.     MOTIONS CURRENTLY BEFORE THE COURT

As noted above, the parties discussed several Motions at the August 6, 2012, hearing. Each such Motion will be addressed in turn.

A.     Defendants' Motions to Dismiss [Doc. #15 & 21]

Defendants raise a number of arguments in support of their Motions to Dismiss the Indictment. Except as discussed herein, Defendants raise the same arguments, based on the same facts, as they raised in the Prior Case. Specifically, in the Present Case, as in the Prior Case, Defendants seek dismissal on the following bases: (1) that the EPA exceeded Congressional authority by extending the scope of federal criminal law to discharges that do not impact the waters of the United States; (2) that the CWA and the City's pretreatment program are unconstitutionally vague and ambiguous with regard to whether the conduct alleged in the Indictment was prohibited; (3) that the City's pretreatment program failed to enumerate federal criminal penalties, in violation of the federal regulations; and (4) that because the City has

already imposed punitive fines, the Double Jeopardy Clause bars the subsequent prosecution by the Government in this case. In a detailed and thorough Memorandum Opinion and Order [Doc. #66, case number 1:09CR395], Judge Thomas D. Schroeder denied Defendants' Motions to Dismiss filed in the Prior Case as to each of the arguments noted above.

Based on the briefing presented in the Present Case, and the parties' presentations at the August 6, 2012, hearing, the Court finds that the analysis set forth in Judge Schroeder's Memorandum Opinion and Order remains legally sound and factually applicable to the Present Case with regard to Defendants' arguments noted above.[6] Therefore, the Court hereby fully adopts and incorporates herein Judge Schroeder's Memorandum Opinion and Order, and, based on the analysis therein, denies Defendants' Motions to Dismiss the Indictment with regard to the arguments discussed above.[8]

---

[6] The Court notes that in the present Motions to Dismiss, Defendants incorporated new evidence in support of its argument that the pretreatment program allowed the conduct charged in the Indictment or, in the alternative, that the pretreatment program was unconstitutionally vague and ambiguous. Specifically, Defendants presented a Declaration of Larry Pearce, the drafter of the Consent Order at issue in this case, and a Declaration of James A. Hanlon, the former Director of the Office of Wastewater Management at the EPA. The Court has considered these Declarations for the limited purpose of ruling on the present Motions to Dismiss and finds that they do not change the legal analysis or ultimate conclusion set forth in Judge Schroeder's Memorandum Opinion and Order. Furthermore, the Court's limited consideration of the Hanlon Declaration offers no approval of its admissibility during the course of a trial given the discussion at the hearing that Mr. Hanlon indicated a desire to withdraw his Declaration.

[8] The Court notes that, as part of his Memorandum Opinion and Order, Judge Schroeder addressed the argument that Congress impermissibly delegated its authority under the CWA without setting forth "intelligible principles" to guide the agency. Judge Schroeder found that delegation under the CWA was appropriate under the factors set forth in Misretta v. United States, 488 U.S. 361, 371-72, 109 S. Ct. 647, 645-55, 102 L. Ed. 2d 714 (1989). In the Present Case, Defendants raise what they consider to be a different argument than that raised in the Prior Case, that is, that Congress violated the Constitution by delegating authority "without

In addition to the arguments raised in the Prior Case, Defendants raise new arguments in the Present Case, which the Court will address herein.  First, Defendants contend that its pretreatment Permit fails to indicate that House of Raeford Farms, Inc. was a source of pollution that was regulated under federal law.  Specifically, Defendants note that the Permit expressly states that the permitted discharge is in compliance with state law, the Sewer Use Ordinance, and "any applicable federal categorical pretreatment regulations."  Defendants further note that the Permit lists the "40 CFR Category" as "N/A."  Therefore, according to Defendants, "the express language of the Permit represented to House of Raeford that the Permit was not based on any 'applicable federal categorical pretreatment regulations.'  And the Permit does not identify any other federal regulation as authority for allowing House of Raeford to discharge."  (Def.'s Br. at 36, [Doc. #17]).  As such, Defendants contend that the Permit relied solely on state and local law as the bases for imposing pretreatment requirements and therefore failed to indicate that Defendants could be subject to federal enforcement.

---

providing meaningful constraints."  Defendants appear to contend that when Congress delegates authority to set federal criminal law, "meaningful constraints" are required which, according to Defendants, provides a different standard than "intelligible principles."  In support of its position, Defendants cite <u>Touby v. United States</u>, 500 U.S. 160, 111 S. Ct. 1752, 114 L. Ed. 2d 219 (1991) and <u>United States v. Arch Trading Co.</u>, 987 F.2d 1087, 1093 (4th Cir. 1993).  However both <u>Touby</u> and <u>Arch Trading</u> rely on the "intelligible principles" doctrine in determining whether delegation was appropriate in the criminal context.  In addition, the <u>Touby</u> Court expressly declined to resolve, based on the circumstances of that case, whether something more than "intelligible principles" was required in delegation related to the promulgation of criminal sanctions.  <u>See</u> <u>Touby</u>, 500 U.S. at 165-66, 111 S. Ct. at 1756.  As such, to the extent that Defendants' present argument regarding delegation differs from any delegation argument raised in the Prior Case, the Court finds that Judge Schroeder's Memorandum Opinion and Order remains applicable.  The Court will therefore deny Defendants Motion to Dismiss on delegation grounds.

In support of this position, Defendants direct the Court's attention to an EPA Report, wherein Defendants contend that the EPA found that "'there was not sufficient evidence of pass through or interference from [poultry processing] facilities to warrant establishing national pretreatment standards for these facilities.'" (Def.'s Br. at 4 (quoting Effluent Limitations Guidelines and New Source Performance Standards for the Meat and Poultry Products Point Source Category ("EPA Report"), 69 Fed. Reg. 54476-01, at 54488 (Sept. 8, 2004)). According to Defendants, the above-referenced language establishes that poultry processing facilities are not subject to federal regulation. However, as expressly stated in the EPA Report, "[i]ndirect dischargers (i.e., facilities that discharge their MPP process wastewater to a publicly owned treatment works) remain subject to the General Pretreatment Standards (40 CFR 403) and local limitations." EPA Report, 69 Fed. Reg. 54476-01, at 54488. Therefore, the EPA Report merely found that poultry processing facilities that operated as indirect dischargers to a POTW would not be subject to specific categorical pretreatment standards, but *would* be subject to the general pretreatment standards and requirements set forth under 40 C.F.R. § 403.

The Permit in this case specifically references 40 C.F.R. § 403 on several occasions. For example, in Part II, Paragraph 7, the Permit states that "Bypass approval shall be given only when such bypass is in compliance with 40 C.F.R. § 403.17." In addition, in Part II, paragraph 29, under the heading "General Prohibitive Standards," the Permit states, "The Permittee shall comply with the general prohibitive discharge standards in 40 C.F.R. § 403.5 (a) and (b) of the Federal pretreatment regulations." Furthermore, the Permit adopts all definitions of the Sewer Use Ordinance and cites the Sewer Use Ordinance as an authority. The Sewer Use Ordinance

9

defines a number of its terms and sets forth a number of requirements per the corresponding federal statute and/or regulations. For example, the Sewer Use Ordinance defines "Industrial User" as "any person which is a source of indirect discharge." The Sewer Use Ordinance further defines "Indirect Discharge" as "the discharge or the introduction from any nondomestic source regulated under [33 U.S.C. § 1317], into the POTW." As such, both the Permit and the Sewer Use Ordinance together clearly indicate the presence of federal regulation for an industrial user such as House of Raeford Farms, Inc. As such, Defendants' Motion to Dismiss should also be denied as to this new argument.

Second, Defendants ask the Court to reconsider its February 29, 2012, Order wherein the Court dismissed the Superseding Indictment in the Prior Case without prejudice based on a Speedy Trial Act violation. Specifically, Defendants contend that, based on the other arguments asserted throughout the briefing in support of their Motions to Dismiss, Defendants have shown that the violations alleged in this case are not serious. Because seriousness of the offense is one of the factors the Court considered in dismissing the Superseding Indictment without prejudice, pursuant to 18 U.S.C. § 3162(a)(2), Defendants contend that the Court should revisit its prior decision and dismiss this matter with prejudice. In considering Defendants' position, the Court first notes that there is no Speedy Trial Act violation at issue in the Present Case. Furthermore, because the Court has denied Defendants' other arguments for purposes of this Motion to Dismiss, the Court finds no reason to revisit its prior analysis regarding the seriousness of the alleged offenses in this case.

For all the reasons stated above, the Court will deny Defendants' Motions to Dismiss the Indictment on all grounds.

B.      Defendants' Motions for a Bill of Particulars [Doc. #24 & 28]

Defendants filed Motions for a Bill of Particulars seeking additional information regarding each Count of the Indictment.  At the August 6, 2012, hearing, Defendants indicated that the Government had provided an adequate response to Defendants' Motions and that Defendants did not wish to be heard further on the matter.  As such, the Court will rely on Defendants' representations at the hearing, and will therefore deny as moot Defendants' Motions for a Bill of Particulars.

C.      Defendant House of Raeford's Motion to Suppress [Doc. #25]

Defendant House of Raeford seeks to suppress "the testimony of current House of Raeford employees at trial, because those employees were questioned by the government in violation of House of Raeford's Sixth Amendment right to counsel and its Fifth Amendment right against self-incrimination."  (Def.'s Mot. at 1, [Doc. #25]).  With regard to the Sixth Amendment challenge, which Defendant House of Raeford did not raise in the Prior Case, Defendant House of Raeford contends that the Government conducted post-indictment interviews with House of Raeford Farms, Inc. employees outside of the presence of corporate counsel, in violation of Defendant House of Raeford's Sixth Amendment right to counsel.

In support of its position that the Government's actions violated Defendant House of Raeford's Sixth Amendment right to counsel, Defendant House of Raeford cites to a number of cases which generally find that defendant corporations do have a right to counsel under the

Sixth Amendment. See United States v. Unimex, Inc., 991 F.2d 546, 549 (9th Cir. 1993) ("[Defendant] argues and the government concedes that a corporation has a Sixth Amendment right to be represented by counsel."); United States v. Rad-O-Lite of Philadelphia, Inc., 612 F.2d 740, 743 (3d Cir. 1979). In addition, Defendant House of Raeford cites to a New Jersey Supreme Court case wherein the court, primarily tasked with reviewing the application of New Jersey Rules of Professional Conduct, noted the potential Sixth Amendment implications during unqualified interviews of corporate employees. See Matter of 668 Advisory Comm. on Prof'l Ethics, 633 A.2d 959, 963 (N.J. 1993) ("A corporation's Sixth Amendment right to counsel may be implicated if government prosecutors might, after indictment, unqualifiedly interview the individual whose conduct establishes the guilt of the corporation."). Defendant House of Raeford also cites to a Department of Justice Memorandum from 1994, which discusses a corporation's Sixth Amendment right to counsel in the context of "high-level corporate executives," noting that interrogation of those persons, outside of the presence of corporate counsel, would violate the corporation's Sixth Amendment right to counsel. See Memorandum for Merrick B. Garland Principal Assoc. Deputy Attorney General, Dep't of Justice (April 15, 1994), http://www.justice.gov/olc/garland.htm.

In its Response, the Government does not contest that Defendant House of Raeford, as a corporation, generally has a Sixth Amendment right to counsel in this criminal matter. However, the Government contends that it complied with the Sixth Amendment and with the North Carolina Rules of Professional Conduct when it interviewed the employees at issue because, even though corporate counsel was not present, counsel for the individual employees

was present at each interview.  See N.C. Rules of Professional Conduct 4.2 cmt. 9 ("If an employee or agent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication would be sufficient for purposes of this Rule."); see also ABA Model Rule of Professional Conduct 4.2 cmt. 7 ("If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.").[9]  In addition to its contention that each interviewee was represented by his or her own counsel, the Government contends, primarily in response to the Department of Justice Memorandum cited by Defendant House of Raeford, that none of the employees interviewed were "high-level corporate executives." Rather, the Government argues that the interviewees were lower-level employees acting as fact witnesses in this case.  As such, the Government contends that it did not violate Defendant House of Raeford's Sixth Amendment right to counsel by interviewing non-executive employees outside of the presence of corporate counsel.

In considering the parties' arguments with regard to Defendant House of Raeford's Sixth Amendment challenge, the Court notes that neither party has cited an authority which is directly on point to the matter at issue.  Specifically, although Defendant House of Raeford cites to a number of cases discussing a corporation's Sixth Amendment right to counsel as a general

_____

[9]  The Code of Professional Responsibility adopted by this Court, is the Code of Professional Responsibility adopted by the Supreme Court of North Carolina.  M.D.N.C. Local Rule 83.10e(b).  However, "while this Court has adopted the North Carolina professional code as its code of conduct, it still must look to federal law for interpretation of those canons and in doing so may consult federal case law and other widely accepted national codes of conduct such as the ABA model Rules."  McCallum v. CSX Transp., Inc., 149 F.R.D. 104, 108 (M.D.N.C. 1993).

matter, none of those cases discuss, or even reference, the extent to which a corporation's Sixth Amendment right to counsel extends to interviews of corporate employees. See <u>Maine v. Moulton</u>, 474 U.S. 159, 170, 106 S. Ct. 477, 484, 88 L. Ed. 2d 481 (1985) (discussing when the right to counsel under the Sixth Amendment attaches in the context of an individual defendant, without reference to any corporation); <u>Unimex, Inc.</u>, 991 F.2d at 549 (finding that a corporation does not have the right to appointed counsel under the CJA, but further finding that the government's act of taking away all corporate assets, such that the corporation could not afford counsel, did violate the Sixth Amendment right to counsel); <u>Rad-O-Lite</u>, 612 F.2d at 743 (discussing a corporation's right to effective assistance of counsel). Furthermore, the New Jersey Supreme Court case did not create any rule of law regarding the Sixth Amendment rights of corporations. Instead, the court pondered hypothetical situations where the Sixth Amendment *may* be implicated, but turned its primary focus to setting interim rules of professional conduct and making recommendations to the Rules committee, which the court expressly states were not binding on the committee. <u>Matter of Opinion 668</u>, 633 A.2d at 960 ("Today we set forth interim rules of conduct that will provide guidance to the bench and bar pending our final resolution of the issues. The committee should not consider those rules as binding on it; its recommendations should be independent of them except for such weight as the committee concludes their merit deserves."). In addition, although the Department of Justice Memorandum discussed the Sixth Amendment implications of conducting ex parte interviews of "high-level corporate executives," the Memorandum did not discuss the Sixth Amendment implications of interviewing any other corporate employees.

The Court notes, however, that at least one federal case, from the Northern District of Illinois, would appear to support the Government's position over Defendant House of Raeford's position in this case. In United States v. Bhutani, 914 F. Supp. 1539 (N.D. Ill. 1995), the defendant corporation filed a motion seeking to prohibit the government from interrogating present or former employees of the defendant corporation "whose acts or omissions can legally bind the Corporation, or whose statements may constitute admissions on the part of the Corporation without notice to [the corporation] and an opportunity for [the corporation's] counsel to be present." Bhutani, 914 F. Supp. at 1540 (internal quotations omitted). Based on the defendant's motion, the court noted that the defendant's request would entitle corporate counsel to be present at "all interviews the government might conduct with even low level employees of the corporation who participated in the conduct in question. This would include, for instance, manual laborers who might have loaded[,] misbranded[,] or adulterated drugs for interstate shipment." Id. The court further noted that because the defendant did not argue that the Sixth Amendment rights of the corporation were greater than those of an individual, the defendant's request could be analogized to a multi-defendant conspiracy cases involving individual defendants. Id. at 1540-41. In that vein, the court noted that, if the defendant corporation's alleged Sixth Amendment theory were correct, "counsel for a defendant charged with a conspiracy, or potentially liable for the acts of a co-conspirator, would have to be given notice and an opportunity to be present before the government could interview the co-conspirator who was willing to provide information." Id. Upon considering the implications of the defendant's Sixth Amendment theory, the court ultimately found that the defendant was

"invoking a non-existent rule" and that "[n]othing prevents the government from interviewing, without notice to [the corporation] . . . former employees and present non-managerial employees." <u>Id.</u> at 1541. The court further found, however, that "government interviews of managerial employees for the purpose of eliciting statements that would be independently admissible against [the corporation]" as "admissions" of the corporation, would implicate the Sixth Amendment. <u>Id.</u>

Based on the information presently before the Court, including all applicable precedent, the Court finds that there is no evidence that the Government violated Defendant House of Raeford's Sixth Amendment right to counsel in this case when it interviewed non-managerial or lower-level employees outside of the presence of corporate counsel. Defendant House of Raeford did not argue or present evidence showing that the employees interviewed were corporate executives or managers. Moreover, Defendant House of Raeford failed to present any relevant support for its position that interviews with non-executives or non-managers outside of the presence of corporate counsel would violate the corporation's Sixth Amendment right to counsel. As such, to the extent that Defendant House of Raeford seeks to suppress any evidence based on Sixth Amendment grounds, the Court will deny House of Raeford's Motion to Suppress. However, the Court notes that nothing in this Order prohibits Defendant House of Raeford from raising objections to the admission of evidence based on any applicable rules under the Federal Rules of Evidence.

With regard to Defendant House of Raeford's Fifth Amendment argument, which was raised in the Prior Case, Defendant House of Raeford contends that, in light of the Supreme

16

Court's decision in <u>Citizen's United v. FEC</u>, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), Defendant House of Raeford, as a corporation, has a right under the Fifth Amendment against self incrimination. Defendant House of Raeford further contends that the Government violated such right by compelling documents and statements from House of Raeford Farms, Inc. and its employees. In making its argument, at least in its brief, Defendant House of Raeford concedes that since the Supreme Court issued its decision in <u>Hale v. Henkel</u>, 201 U.S. 43, 26 S. Ct. 370, 50 L. Ed. 652 (1906), *overruled in part on other grounds by* <u>Murphy v. Waterfront Comm'n of New York Harbor</u>, 378 U.S. 52, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964), corporations "have not enjoyed a right against self-incrimination." (Def.'s Mot. at 4, [Doc. #25]). However, Defendant House of Raeford contends that <u>Citizen's United</u> changed longstanding precedent regarding the Fifth Amendment in that it prohibited the government from discriminating against the "corporate identity" of a speaker for First Amendment purposes. Defendant House of Raeford contends that this "anti-discrimination rule" goes beyond the specific right addressed in <u>Citizen's United</u>, that being freedom of speech under the First Amendment, and requires a finding that the Fifth Amendment right against self-incrimination should apply to corporations. The Government, in response, contends that the opinion in <u>Citizen's United</u> related only to the First Amendment issue presented in that case and included no opinion regarding a corporation's Fifth Amendment right. against self- incrimination In addition, the Government contends that nowhere in <u>Citizens United</u> did the Supreme Court explicitly or implicitly overturn <u>Hale v. Henkel</u>. As such, the Government contends that <u>Hale</u> and its progeny govern in this case such

that Defendant House of Raeford, as a corporation, is not entitled to a right against self-incrimination under the Fifth Amendment.

As noted above, Defendant House of Raeford raised its Fifth Amendment challenge in the Prior Case. Because, as the Government correctly notes, <u>Citizen's United</u> did not address the issue currently before the Court, the Court reiterates Judge Schroeder's concern from the Prior Case, that Defendant House of Raeford is essentially asking this Court to "preemptively overturn a Supreme Court precedent when the Supreme Court has not precisely ruled on the issue." (Mot. Hr'g Tr. at 82-83, [Doc. #77, case number 1:09-CR-395]). Longstanding precedent counsels against such action by this Court. <u>West v. Anne Arundel County, Maryland</u>, 137 F.3d 752, 760 (4th Cir. 1998) (noting that "[l]ower federal courts have repeatedly been warned about the impropriety of preemptively overturning Supreme Court precedent" and that lower courts should leave to the Supreme Court "the prerogative of overturning its own decisions." (internal quotations omitted)). As such, to the extent that Defendant House of Raeford seeks to suppress any evidence based on its alleged Fifth Amendment right against self-incrimination, no such right exists for Defendant House of Raeford, as a corporation, under current precedent, and its Motion to Suppress will therefore be denied.


D.    <u>Defendant Steenblock's Motion in Limine to Prohibit Evidence of or Jury Argument Regarding the "Responsible Corporate Officer" Doctrine [Doc. #30]</u>

Defendant Steenblock moves for an order precluding the Government from arguing to the jury or presenting any evidence that Defendant Steenblock is a "responsible corporate

officer," as is alleged in the Indictment. Defendant Steenblock contends that the Court should not allow the Government to expand the responsible corporate officer doctrine, as that doctrine was addressed by the Supreme Court in United States v. Dotterweich, 320 U.S. 277, 64 S. Ct. 134, 88 L. Ed. 48 (1943) and United States v. Park, 421 U.S. 658, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975), to apply to felony violations of the Clean Water Act, such as in this case, which require proof that a defendant acted knowingly. Defendant Steenblock contends that the doctrine only applies in the context of negligent violations, which do not require proof of knowledge, but only require proof that the defendant "'had a responsible relation to the situation,' and 'by virtue of his position . . . had . . . authority and responsibility' to deal with the situation." Park, 421 U.S. at 673, 95 S. Ct. at 1912 (alterations in original). In support of its argument, Defendant Steenblock cites to the First Circuit case United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35 (1st Cir. 1991). In that case, the court found error in the district court's jury instructions regarding the responsible corporate officer doctrine, in a case involving a felony offense which required proof that the defendant acted knowingly, where the instructions permitted the jury to find the defendant guilty only on the basis: "(1) that the defendant was a corporate officer; (2) with responsibility to supervise the allegedly illegal activities; and (3) knew *or believed* that the illegal activity of the type alleged occurred." United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 52 (1st Cir. 1991) (internal quotations omitted) (emphasis added). The court found that the instructions given allowed "proof that [the defendant] was a responsible corporate officer [to] conclusively prove the element of his knowledge." Id. Defendant Steenblock seeks to prohibit the Government from

impermissibly using the same proof offered in MacDonald to meet its burden of proving beyond a reasonable doubt Defendant Steenblock's knowledge with respect to the conduct alleged in this case. Defendant Steenblock contends that the Government is required to prove, beyond a reasonable doubt, the elements of a felony CWA violations, as set forth in United States v. Wilson, including "knowledge of the facts meeting each essential element of the substantive offense." Wilson, 133 F.3d 251, 264 (4th Cir. 1997).

In its Response, the Government contends that nothing in the CWA, and specifically nothing in the criminal statute at issue, 33 U.S.C. § 1319, limits application of "responsible corporate officer" liability to negligent violations of the CWA. Rather, the statute merely states that any "person" who knowingly violates any requirement imposed in an approved pretreatment program shall be punishment by imprisonment for not more than three years. 33 U.S.C. § 1319(c)(2)(A). The Government notes that the statutory definition of "person" includes "any responsible corporate officer." 33 U.S.C. § 1319(c)(6). The Government contends that, contrary to Defendant Steenblock's expressed concerns, the Government does not intend to use the "responsible corporate officer" doctrine as a substitute for establishing the "knowledge" element for any conduct charged. Rather, the Government intends to prove Defendant Steenblock's knowledge in a manner that comports with the Ninth Circuit case United States v. Iverson, 162 F.3d 1015 (9th Cir. 1998). In that case, the Ninth Circuit upheld jury instructions for felony violations of the CWA which stated that the jury could find the defendant guilty upon proof beyond a reasonable doubt: "(1) [t]hat the defendant had knowledge of the fact that pollutants were being discharged to the sewer system by employees

of [the corporation]; (2) [t]hat the defendant had the authority and capacity to prevent the discharge of pollutants to the sewer system; and (3) [t]hat the defendant failed to prevent the on-going discharge of pollutants to the sewer system." Iverson, 162 F.3d at 1022-25. In upholding the district court's instruction, the Ninth Circuit noted that "the 'responsible corporate officer' instruction relieved the government *only* of having to prove that defendant *personally* discharged or caused the discharge of a pollutant. The government still had to prove that the discharges violated the law and that defendant knew that the discharges were pollutants." Id. at 1026. In the present case, the Government contends that it expects to proffer evidence to prove that Defendant Steenblock: (1) had knowledge of the bypasses, (2) had the authority and capacity to prevent the unlawful discharge based on his position as Plant Manager; and (3) that even though Steenblock knew of the bypasses and had the authority to prevent them, he failed to do so.

Based on the representations by the parties in this case, the Court finds that the Government may introduce evidence that Defendant Steenblock was a responsible corporate officer in the context of this case. To that extent, the Court will deny Defendant Steenblock's Motion in Limine. However, the Court notes that nothing in this Order relieves the Government of its burden to prove Defendant Steenblock's "knowledge of the facts meeting each essential element of the substantive offense" as is required by Wilson, and the Court will provide adequate instructions regarding the same to the jury.

E.      Defendants' Motion to Compel Discovery [Doc. # 35]

Defendants filed a Motion to Compel Discovery seeking "disclosure by the government of any and all previously undisclosed matters." At the August 6, 2012, hearing, Defendants indicated that they did not wish to be heard further on the matter. Therefore, based on Defendants representations at the hearing, the Court will deny as moot Defendants' Motion to Compel Discovery.

Based on the foregoing, IT IS THEREFORE ORDERED that Defendants' Motions to Dismiss the Indictment [Doc. #15 & #21] are hereby DENIED as set forth herein.

IT IS FURTHER ORDERED that Defendants' Motions for a Bill of Particulars [Doc. #24 & #28] are hereby DENIED as MOOT as set forth herein.

IT IS FURTHER ORDERED that Defendant House of Raeford's Motion to Suppress [Doc. #25] is hereby DENIED as set forth herein.

IT IS FURTHER ORDERED that Defendant Steenblock's Motion in Limine to Prohibit Evidence of or Jury Argument Regarding the "Responsible Corporate Officer" Doctrine [Doc. #30] is hereby DENIED as set forth herein.

IT IS FURTHER ORDERED that Defendants' Motion to Compel Discovery [Doc. #35] is hereby DENIED as MOOT as set forth herein.

IT IS FURTHER ORDERED that Defendants' Joint Motion to Authorize Juror Questionnaire [Doc. #26] is hereby DENIED as set forth herein.

IT IS FINALLY ORDERED that the Government's Motion in Limine [Doc. #33] is GRANTED IN PART as set forth herein. Specifically, evidence of the prior convictions of Government witness Wilford Washington, which are all more than ten (10) years old, shall be

excluded.  In addition, unless the Government raises the issue of the City of Raeford's violations of its National Pollutant Discharge Elimination System ("NPDES") permit, Defendants are excluded from introducing evidence of such violations directly.  Except as expresly stated herein, the Court hereby reserves ruling on the remaining parts of the Government's Motion in Limine and will permit the parties to address any issues raised therein as such issues may arise during the course of trial.

This the 10th day of August, 2012.

_James A. Beaty_
United States District Judge