IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA    )
                            )
        v.                  )           1:12CR248-1
                            )
HOUSE OF RAEFORD FARMS, INC. )
_____ )

<u>MEMORANDUM OPINION AND ORDER</u>

BEATY, District Judge.

This matter is before the Court on three (3) Motions filed by Defendant House of Raeford Farms, Inc. ("House of Raeford"). On August 20, 2012, a jury found House of Raeford guilty on Counts 1, 3, 6, and 8-14, of a fourteen-count Indictment. The jury found House of Raeford not guilty on Counts 2, 4, 5, and 7. House of Raeford thereafter filed a Motion to Arrest Judgment [Doc. #69], a Motion for New Trial [Doc. #68], and a Motion for Judgment of Acquittal [Doc. #67]. The Motions are fully briefed and are ready for the Court's review. For the reasons set forth below, the Court will deny House of Raeford's Motions. Each Motion will be addressed in turn.

I.    MOTION TO ARREST JUDGMENT

In its Motion to Arrest Judgment, House of Raeford contends that the conduct charged in the Indictment, that is, discharging untreated wastewater to the City of Raeford[1] Publicly Owned Treatment Works ("POTW") in violation of a requirement of a pretreatment program,

---

[1] Throughout this Memorandum Opinion and Order, the Court will refer to the City of Raeford as "the City."

does not constitute a federal crime over which this Court has jurisdiction to enter judgment. In support of its Motion, House of Raeford re-raises several legal arguments that this Court previously addressed and dismissed in its Memorandum Opinion and Order [Doc. #55] denying House of Raeford's pre-trial Motion to Dismiss.  Specifically, House of Raeford contends that the Indictment fails to charge any federal crime because (1) "the Clean Water Act violates the Constitution by delegating to local governments the legislative power to set federal criminal law without providing meaningful limitations and constraints on their authority;" (2) the City's pretreatment program fails to enumerate federal criminal penalties, as required by EPA regulations; (3) "the Indictment impermissibly extends the scope of federal criminal law to punish, as federal felonies, alleged violations of a local pretreatment requirement that did not cause pass-through or interference;" and (4) "the Double Jeopardy clause bars reprosecution of charges for which the City has already imposed punitive fines."  (House of Raeford Br. at 2, [Doc. #77]).  House of Raeford acknowledges that these arguments are the same as those raised previously in its Motion to Dismiss, and does not presently provide any new legal standard or argument as to these matters.  Therefore, the Court need not and will not reconsider these matters at this time.

In addition, House of Raeford contends, as a new legal argument, that the Indictment fails to charge any federal crime because the City's pretreatment program falls outside of North Carolina's "federally approved program" under the Clean Water Act, 33 U.S.C. § 1342(b)(8). Section 1342(b)(8) governs the National Pollutant Discharge Elimination System ("NPDES") permitting process, under which the EPA may approve NPDES permits for states and grant

2

such states the authority to operate their own NPDES permitting programs at the local level. As House of Raeford notes in its Brief in support of its Motion to Arrest Judgment, in order to obtain EPA approval to administer an NPDES permit program, "a state program must include a state-wide pretreatment program." (House of Raeford's Br. at 3, [Doc. #77] (citing 33 U.S.C. § 1342(b)(8))). House of Raeford acknowledges that North Carolina's state-wide pretreatment program requires the City to implement a pretreatment program. However, for the reasons discussed below, House of Raeford contends that *federal* law does not require the City to implement a pretreatment program, and, therefore, violation of a requirement of the City's pretreatment program could not form the basis for a federal crime.

In support of its position, House of Raeford cites to 40 C.F.R. § 403.8(a), which states as follows:

> Any POTW . . . with a total design flow greater than 5 million gallons per day (mgd) and receiving from Industrial Users pollutants which Pass Through or Interfere with the operation of the POTW or are otherwise subject to Pretreatment Standards will be required to establish a POTW Pretreatment Program. . . . The Regional Administrator or Director may require that a POTW with a design flow of 5 mgd or less develop a POTW Pretreatment Program if he or she finds that the nature or volume of the industrial influent, . . . violations of POTW effluent limitations, contamination of municipal sludge, or other circumstances warrant in order to prevent Interference with the POTW or Pass Through.

40 C.F.R. § 403.8(a). House of Raeford further cites to 40 C.F.R. § 123.1(i)(2), which states that "[i]f an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program." 40 C.F.R. § 123.1(i)(2). Based on these two regulations, House of Raeford contends that federal law requires a POTW to implement a pretreatment program *only if* the POTW has a total design flow of greater than

5 million gallons per day. Therefore, House of Raeford contends that pretreatment programs operated by POTW's with a total design flow of 5 million gallons per day or less would fall outside of the scope of a federally approved pretreatment program.

With regard to the present case, House of Raeford contends that the Indictment does not allege that the City POTW has a total design flow of greater than 5 million gallons per day and, therefore, the City would not be required under 40 C.F.R. § 403.8(a) to operate a pretreatment program. As such, House of Raeford contends that to the extent that North Carolina has required the City to operate a pretreatment program, that pretreatment program exceeds the scope of North Carolina's "federally approved" pretreatment program, and any violation of a requirement of the City's pretreatment program would not be subject to federal criminal prosecution.

In considering House of Raeford's Motion to Arrest Judgment, the Court must look only to the record in the case, that is, the "indictment, the plea, [and] the verdict," and not to the evidence adduced during the trial in this case. See United States v. Sisson, 399 U.S. 267, 281-82 & n.10, 90 S. Ct. 2117, 2125 & n.10, 26 L. Ed. 2d 608 (1970) (noting that "in granting a motion in arrest of judgment under [Federal Rule of Criminal Procedure 34], a district court must not look beyond the face of the record," which includes "no more than the indictment, the plea, the verdict, and the sentence" (internal quotations and citations omitted)). In the present case, the Indictment charges House of Raeford with multiple violation of the Clean Water Act, pursuant to 33 U.S.C. § 1319(c)(2)(A). Under 33 U.S.C. § 1319(c)(2)(A), the federal government has the authority to prosecute knowing violations of *any* requirement imposed in a pretreatment

program approved under 33 U.S.C. § 1342(b)(8).  The Indictment in this case alleges that the EPA approved North Carolina's NPDES program, and granted North Carolina the authority to impose and enforce local pretreatment programs pursuant to Section 1342(b)(8). Furthermore, the Indictment alleges that, pursuant to its federally-delegated authority, North Carolina approved the City's pretreatment program in 1983 and required enforcement of that program through the City's NPDES permit.  Although House of Raeford is correct that the Indictment does not allege that the City POTW has a design flow of greater than 5 million gallons per day, for the reasons set forth below, that fact does not require the conclusion that the Government has failed to charge a federal crime for the violation of a requirement of the City POTW's pretreatment program.

Title 40, Code of Federal Regulations, Section 403.8(a), expressly grants the Regional Administrator of the EPA or the Director of the State NPDES program the authority to require that a POTW with a design flow of 5 million gallons per day or less develop a pretreatment program under certain circumstances.  Therefore, it follows that to the extent that a Regional Administrator or Director exercises his authority under Section 403.8(a) to require that a POTW with a design flow of 5 million gallons per day or less develop a pretreatment program, such a program would be part of the "federally approved" program.  See Welch Foods, Inc. v. Borough of North East, 46 Fed. App'x 678, 683 (3rd Cir. 2002) ("As a general matter, POTWs . . . that have design flows less than five million gallons per day are not required to implement pretreatment programs; however, they may be required to do so if the [Regional Administrator or the Director] determines that a program is warranted in order to prevent 'pass through' or

'interference.'"). The Indictment in this case alleges that North Carolina exercised its authority under federal law to approve the City's pretreatment program and require its implementation through the City's NPDES permit, such that the City's pretreatment program would fall within North Carolina's "federally approved" program.

Furthermore, to the extent that House of Raeford contends that North Carolina acted pursuant to state law only, and not federal law, when it required the City to implement its approved pretreatment program, the Court notes that the North Carolina regulation titled "Required Pretreatment Programs" incorporates by reference 40 C.F.R. § 403.8(a), the very provision House of Raeford cites as the basis for its argument. See 15A N.C.A.C. § 2H.0904. Therefore, to the extent that House of Raeford contends that North Carolina law requires pretreatment programs for a different, broader, group of POTWs than does federal law, such a contention fails, as both North Carolina and federal law require pretreatment programs in accordance with the provisions of 40 C.F.R. § 403.8(a). Based on the foregoing, to the extent that the Indictment in this case alleges that the City operates an approved pretreatment program, the Court finds that such a program was approved in accordance with federally delegated authority and in accordance with the applicable federal regulations. As such, the Court finds that the City's pretreatment program is a pretreatment program approved pursuant to 33 U.S.C. § 1342(b)(8).[2]

---

[2] House of Raeford's argument in its Motion to Arrest Judgment is similar to that raised by the defendant in a Clean Water Act case out of the Eastern District of Michigan. See United States v. Panyard, No. 07-20037, 2009 WL 37377 (E.D. Mich. Jan. 7, 2009), aff'd by 403 Fed. App'x 17 (6th Cir. 2010). In Panyard, the defendant worked for CESI, an industrial waste treatment and storage facility. Id. at *1. CESI operated under a discharge permit issued by the

Based on the foregoing, the Court concludes that, pursuant to the charges set forth in the Indictment and the verdict rendered by the jury in this case, the Court has jurisdiction to enter judgment against House of Raeford. As such, the Court will deny House of Raeford's Motion to Arrest Judgment on all grounds.

## II. MOTION FOR NEW TRIAL

In addition to its Motion to Arrest Judgment, House of Raeford has filed a Motion for New Trial, contending that the Court erred by refusing to give certain jury instructions requested by House of Raeford. Pursuant to the Federal Rules of Criminal Procedure, Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). With regard to jury instruction challenges, a district court is required to give a requested instruction only when such an instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct its defense." United States v. Lighty, 616 F.3d 321, 366 (4th Cir. 2010). The

---

local entity, the Detroit Water and Sewerage Department ("DWSD"), which was authorized to issue such permits as part of Michigan's EPA-approved NPDES program. Id. CESI's permit required CESI to operate a pretreatment program that prohibited bypass. Id. at *2. Much like House of Raeford in this case, the defendant in Panyard was charged with bypassing the pretreatment system and discharging wastewater into the municipal sewer system in violation of 33 U.S.C. § 1319(c)(2)(A). Id. Following his conviction, the defendant in Panyard, like House of Raeford, filed a Motion to Arrest Judgment, arguing that the pretreatment program at issue was created by the local entity that issued discharge permits and was not mandated by federal law. Id. The district court disagreed with the defendant, and the Sixth Circuit affirmed, holding that "[i]n granting CESI's discharge permit, DWSD acted pursuant to its authority under Michigan's EPA-approved NPDES program, and, therefore, the pretreatment program itself is one 'approved under' § 1342(b)(8)." Id. at *4.

relevant inquiry is "whether, taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." Id. In this case, House of Raeford contends that the Court erred in refusing to give two separate requested instructions related to (A) the *mens rea* required for the offenses charged, and (B) the definition of "approved pretreatment program." The Court will address each challenge in turn.

A. <u>*Mens Rea* Instruction</u>

House of Raeford first challenges the Court's refusal to give House of Raeford's requested instruction as to the *mens rea* required for the offenses charged in the Indictment. House of Raeford submitted proposed jury instructions requesting what House of Raeford contended were the elements of the offenses charged, in light of the *mens rea* requirement under the statute, that is, "knowingly." Specifically, House of Raeford proposed, as an essential element of the offenses charged, that the Government must prove beyond a reasonable doubt "[t]hat House of Raeford knew the discharge violated a requirement of the approved pretreatment program and did not mistakenly believe the discharge was permitted." (House of Raeford's Proposed Jury Instructions at 3, [Doc. #64]). At the charge conference, House of Raeford argued, as it does in its present Motion for New Trial, that the Fourth Circuit's decision in <u>United States v. Wilson</u>, 133 F.3d 251 (4th Cir. 1997), mandates House of Raeford's requested instruction. The Court, however, rejected House of Raeford's interpretation of <u>Wilson</u> and denied House of Raeford's jury instruction request. As a result, the Court gave the following instructions as to the essential elements of the offenses charged in Counts 1-14:

> FIRST: On or about the date charged in the Indictment, the defendant
> discharged, or caused others to discharge, untreated wastewater to the

Raeford Publicly Owned Treatment Works ("POTW");

SECOND: The discharge was in violation of a requirement of the pretreatment program, that is, the prohibition against unlawful bypass;

THIRD: The pretreatment program was a program administered by a POTW that had been approved by the U.S. Environmental Protection Agency ("EPA") or by a State; and

FOURTH: The defendant acted knowingly, that is,
(a) the defendant discharged, or caused others to discharge, untreated wastewater voluntarily and intentionally and not because of mistake or accident;
(b) the defendant knew that the material discharged was untreated wastewater; and
(c) the defendant knew that the discharge was into a sewer or a publicly-owned treatment works.

As background, United States v. Wilson involved a defendant who was charged with violating the Clean Water Act by knowingly discharging pollutants into wetlands without a permit, in violation of 33 U.S.C. § 1319(c)(2)(A) and § 1311(a). The defendant in Wilson challenged the jury instructions given by the trial court on the grounds that the court failed to properly instruct the jury on the *mens rea* required under Section 1319(c)(2)(A), that is, "knowingly." The defendant also argued that the Clean Water Act required a showing that the defendant was aware of the illegality of his conduct. The Fourth Circuit ultimately found that the government must prove "the defendant's knowledge of the facts meeting each essential element of the substantive offense *and not the fact that defendant knew his conduct was illegal.*" Wilson, 133 F.3d 251, 264 (4th Cir. 1997) (emphasis added). As a result, the Fourth Circuit concluded that the government must prove the following:

(1) that the defendant knew that he was discharging a substance, eliminating a prosecution for accidental discharges; (2) that the defendant correctly identified the

substance he was discharging, not mistaking it for a different, unprohibited substance; (3) that the defendant knew the method or instrumentality used to discharge the pollutants; (4) that the defendant knew the physical characteristics of the property into which the pollutant was discharged that identify it as a wetland, such as the presence of water and water-loving vegetation; (5) that the defendant was aware of the facts establishing the required link between the wetland and waters of the United States; and (6) that the defendant knew he did not have a permit.

Id.  As to element number six, the Fourth Circuit further stated that "[t]his last requirement does not require the government to show that the defendant knew that permits were available or required.  Rather, it, like the other requirements, preserves the availability of a mistake of fact offense if the defendant has something he mistakenly believed to be a permit to make the discharges for which he is being prosecuted."  Id.

In the present case, House of Raeford contends that the evidence shows that House of Raeford believed that the Consent Order permitted the conduct charged in this case.  Therefore, in light of the elements set forth in Wilson, particularly the sixth element listed above, House of Raeford contends that it was entitled to an instruction that it "knew it did not have a permit that authorized the discharges" for which it was prosecuted.  (House of Raeford's Br. at 4, [Doc. #76]).  House of Raeford further contends that the Court's refusal to give the requested instruction prohibited House of Raeford from "asserting a defense that the evidence supported."[3]  (House of Raeford's Br. at 4, [Doc. #76]).

For the following reasons, the Court again rejects House of Raeford's contentions regarding its requested instruction.  First, House of Raeford did not ask the Court to instruct

_____

[3]  The Court notes that at no time did House of Raeford request a separate instruction on a mistake-of-fact defense, but rather argued for a mistake-of-fact "offense" in the form of the requested instruction as to the essential elements of the offenses charged.

the jury that "House of Raeford knew it did not have a permit that authorized discharges," as House of Raeford contends in its briefing of the present Motion. Rather, House of Raeford asked the Court to instruct the jury that "House of Raeford knew the discharges violated a requirement of the approved pretreatment program and did not mistakenly believe the discharge was permitted." This latter instruction would require the Government to prove that House of Raeford knew it was acting in violation of the law, an instruction expressly excluded by the Fourth Circuit in Wilson. Specifically, although Wilson requires that the government prove that a defendant knew "'the facts that make his conduct illegal,'" it expressly states that the government need not prove that the defendant "understood the legal consequences of those facts or were even aware of the existence of the law granting them significance." Wilson, 133 F.3d at 262, 264 (internal citation omitted).

In reaching the decision to exclude, as an element, that a defendant knew his conduct violated the law, the Fourth Circuit in Wilson acknowledges that on "first blush," the order of the words in 33 U.S.C. § 1319(c)(2)(A), that is, that "any person who *knowingly violates* [a particular statute, permit condition, and/or pretreatment requirement] . . . shall be punished," "suggests that 'knowingly' modifies 'violates' so that the clause imposes punishment only when one violates the statute with knowledge that he is violating it, *i.e.* with knowledge of the illegality of his conduct." Wilson, 133 F.3d at 261. House of Raeford appears to endorse this "first blush" reading, in that it asked for an instruction that House of Raeford could only be found guilty of violating a requirement of an approved pretreatment program if the Government proved that House of Raeford had knowledge that it was violating such a requirement.

However, the Fourth Circuit in Wilson engages in a lengthy discussion that culminates in the abandonment of its "first blush" reading. As part of that discussion, which includes reference to the common law notion that "ignorance of the law provides no defense to its violation," the Fourth Circuit addressed a significant change to the *mens rea* requirement for felony violations of the Clean Water Act which "cast doubt" on the Court's "first blush" reading of 33 U.S.C. § 1319(c)(2)(A). Id. Specifically, the Fourth Circuit noted that prior to 1987, the Clean Water Act punished violations as felonies only where a defendant engaged in conduct "willfully." "'[W]illful' generally connotes a conscious performance of bad acts *with an appreciation of their illegality*." Wilson, 133 F.3d at 262. In 1987, however, Congress amended the Clean Water Act, changing the *mens rea* for felony violations from "willful" to "knowing." The Fourth Circuit concluded that by amending the Clean Water Act, "Congress intended to provide a different and lesser standard when it used the word 'knowingly.' If we construe the word 'knowingly' as requiring that the defendant must appreciate the illegality of his acts, we obliterate its distinction from the willfulness." Wilson, 133 F.3d at 262; see also id. at 261 (citing the Supreme Court decision in United States v. International Minerals & Chemical Corp., 402 U.S. 558, 562, 91 S. Ct. 1697, 1698-99, 1700, 29 L. Ed. 2d 178 (1971), in which the Supreme Court held that the phrase "knowingly violates any such regulation" was a "'shorthand designation' for knowledge of the specific acts or omissions which violate the Act").[4]

---

[4] The Fourth Circuit cites to a number of Clean Water Act cases throughout Wilson that also have held that the government need not prove that the defendant knew his conduct was illegal. See United States v. Sinskey, 119 F.3d 712, 715-16 (8th Cir. 1997) ("We therefore believe that the underlying conduct of which [the defendant] must have had knowledge is the conduct that is prohibited by the permit. . . . [T]he government was not required to prove that [the

In this case, the Government charged House of Raeford with fourteen counts of discharging untreated wastewater to the City POTW, in violation of a requirement of a pretreatment program approved under Section 1342(b)(8). In accordance with <u>Wilson</u>, as addressed above, the Government was required to prove that House of Raeford knew it was discharging untreated wastewater to the City POTW, which was the specific conduct that violated a requirement of an approved pretreatment program. More specifically, and as instructed in this case, the Government was required to prove that, in violation of an approved pretreatment program: (1) House of Raeford knew it was discharging untreated wastewater to the City POTW, that is, discharging untreated wastewater voluntarily and intentionally and not because of mistake or accident; (2) House of Raeford knew the wastewater discharged to be untreated wastewater, and not a different, permitted substance; and (3) House of Raeford knew it was discharging to the City POTW, and not to some other permitted location. To require that the Government also prove, as an essential element, that House of Raeford knew the discharges violated a requirement of the pretreatment program, would require something that <u>Wilson</u> expressly excluded, that is, proof that House of Raeford knew its conduct was illegal.

---

defendant] knew that his acts violated either the CWA or the NPDES permit, but merely that he was aware of the conduct that resulted in the permit's violation."); <u>United States v. Hopkins</u>, 53 F.3d 533, 541 (2d Cir. 1995) ("[U]nder § 1319(c)(2)(A), the government was required to prove that [the defendant] knew the nature of his acts and performed them intentionally, but was not required to prove that he knew that those acts violated the CWA, or any particular provision of that law, or the regulatory permit issued."); <u>United States v. Weitzenhoff</u>, 35 F.3d 1275, 1286 (9th Cir. 1993) ("The government did not need to prove that [the defendants] knew their acts violated the permit or the CWA."); <u>see also</u> <u>United States v. Moore</u>, No. 97-4344, 1998 WL 67792, at *2 (4th Cir. Feb. 20, 1998) ("With regard to state of mind, under § 1319(c)(2)(A), the Government need only show that the defendant knew the nature of his acts and acted intentionally.").

In addition, even assuming, *arguendo*, that House of Raeford merely sought an instruction that House of Raeford "knew it did not have a permit which authorized the discharges" which, as discussed above, was not the requested instruction, absence of a permit is not an element of the substantive offense charged in this case. See Wilson, 133 F.3d at 264 ("[T]he government need only prove the defendant's knowledge of the facts meeting each essential element of the substantive offense."). As discussed above, Wilson, in which the Fourth Circuit required an instruction that the defendant knew he did not have a permit, involved a defendant who was charged with violating the Clean Water Act by discharging pollutants into the navigable waters of the United States *without a permit*, in violation of 33 U.S.C. § 1311(a) and 33 U.S.C. § 1319(c)(2)(A). In the present case, however, House of Raeford is charged with a different substantive offense than the defendant in Wilson. Specifically, House of Raeford is charged with knowingly discharging untreated wastewater to the City POTW, in violation of a requirement of a pretreatment program approved under Section 1342(b)(8). That offense does not require that the Government prove the absence of a permit, but rather assumes that a permit exists in which the pretreatment program has been incorporated. Therefore, the Court's decision not to instruct the jury that the Government must prove that House of Raeford knew it did not have a permit did not controvert Wilson's requirement that the government prove the defendant's knowledge as to the essential elements of the substantive offense charged.

Based on the foregoing, the Court concludes that the jury instructions given by the Court provided a correct statement of the law. As such, the Court will deny House of Raeford's Motion for New Trial as to its contentions regarding the required *mens rea* instructions.

B.    "Approved Pretreatment Program" Instruction

In addition to House of Raeford's challenge to the Court's instruction on the required *mens rea* in this case, House of Raeford also challenges the Court's instruction regarding the definition of an "Approved Pretreatment Program." House of Raeford requested the following instruction from the Court:

The Indictment alleges that Defendants violated requirements of an Approved Pretreatment Program. The Clean Water Act defines an Approved Pretreatment Program as:

a program administered by a publicly-owned treatment works that meets the criteria established by regulation and that has been approved by the United States Environmental Protection Agency or by a state.

Accordingly, to establish that the City of Raeford's pretreatment program was an Approved Pretreatment Program, the Government must prove beyond a reasonable doubt:
1. That the City's pretreatment program was approved by the State of North Carolina or the United States Environmental Protection Agency; and
2. That the City of Raeford's pretreatment program met the criteria established by the applicable regulation.

In this case, the applicable regulation is 40 C.F.R. § 403.8. To prove compliance with this regulation, the Government must prove beyond a reasonable doubt that, at all times between February 7, 2005 and August 4, 2006, the City of Raeford fully and effectively exercised and implemented authorities and procedures which enabled the City to:

a. Identify and locate all possible Industrial Users which might be subject to the City's Pretreatment Program.
b. Identify the character and volume of pollutants contributed to the City's sewage treatment plant by Industrial Users.
c. Control through permit, order or similar means, the contribution to the City's sewage treatment plant by each Industrial User to ensure compliance with applicable pretreatment standards and requirements. Such control mechanisms must be enforceable and contain conditions stating the applicable civil and criminal penalties for violating pretreatment standards and requirements, and any applicable compliance schedule.
d. Investigate instances of noncompliance with Pretreatment Standards and

Requirements. Sample taking and analysis and the collection of other information shall be performed with sufficient care to produce evidence admissible in enforcement proceedings or in judicial actions.

e. Prepare and maintain a list of the City's Industrial Users that contribute five or more percent of the average hydraulic or organic treatment capacity of the City's sewage treatment plant.

f. Develop and implement an enforcement response plan that contains detailed procedures which meet the requirements specified in 40 C.F.R. § 403(f)(5). And:

g. Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial Users, compliance or noncompliance with the Industrial Users' pretreatment requirements.

(House of Raeford's Proposed Jury Instructions at 6-7, [Doc. # 64]. The Court declined House of Raeford's request and gave the following instruction:

The term "approved pretreatment program" means a program administered by a publicly owned treatment works that meets the criteria established by regulation [and][5] that has been approved by the United States Environmental Protection Agency or by a state.

House of Raeford contends that the Court's failure to provide the entire instruction as requested prejudiced House of Raeford because it removed the Government's burden to prove that the pretreatment program meets all the requirements of the federal regulations during the period of the Indictment. House of Raeford further contends that the evidence shows the City's failure

---

[5] Based on the transcript of the jury instructions, the Court inadvertently omitted the word "and," thus giving the following instruction: "The term 'approved pretreatment program' means a program administered by a publicly owned treatment works that meets the criteria established by regulation *that* has been approved by the United States Environmental Protection Agency or by a state." House of Raeford contends that such omission, in conjunction with the Court's decision not to define the regulations for the jury, as House of Raeford requested, removed the Government's burden to show both that the pretreatment program meets the requirements of the federal regulations *and* that such program was approved by the EPA or a state. However, even without the "and," the instruction reasonably can be read to require both parts of the definition of "approved pretreatment program," that is, that the program (1) meets the criteria established by regulation, and (2) has been approved by the EPA or by a state. Furthermore, as discussed below, the Government's evidence supported a finding of both elements.

to meet the federal requirements during the period of the Indictment, and therefore, a new trial is warranted in this case.

In considering House of Raeford's Motion, the Court notes that the instruction given to the jury set forth both prongs of the definition of an "approved pretreatment program," as defined in the federal regulations. The fact that the Court did not expressly enumerate every sub-section of regulations, including, but not limited to, those selected by House of Raeford in its proposed instruction, did not preclude House of Raeford from arguing to the jury that the Government failed to meet its burden as to either prong of the definition given. Therefore, the Court's failure to give House of Raeford's requested instruction did not seriously impair House of Raeford's ability to conduct its defense. Furthermore, as discussed in more detail below, the Government presented sufficient evidence from which a reasonable juror could find that the City's pretreatment program both met the criteria of the federal regulations and was approved by the State of North Carolina. As such, the Court will deny House of Raeford's Motion for New Trial based on its challenge to the Court's "approved pretreatment program" instruction.

Based on the foregoing, the Court concludes that the Court's instructions, taken as a whole, accurately and fairly state the controlling law, and, therefore, the interest of justice does not require a new trial based on the Court's refusal to give House of Raeford's requested instructions. As such, the Court will deny House of Raeford's Motion for New Trial on all grounds.

III. MOTION FOR JUDGMENT OF ACQUITTAL

House of Raeford also has filed a Motion for Judgment of Acquittal, wherein it

challenges the sufficiency of the Government's evidence on a number of grounds. "A defendant challenging the sufficiency of the evidence faces a heavy burden." United v. Foster, 507 F.3d 233, 245 (4th Cir. 2007). The Court will uphold a jury verdict if, "viewing the evidence in the light most favorable to the government, [the verdict] is supported by substantial evidence." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Palacios, 677 F.3d 234, 248 (4th Cir. 2012) (quotations omitted). In light of this standard, the Court will address, in turn, each ground for acquittal asserted by House of Raeford.

A.   "The Government Failed to Prove That the City's Pretreatment Program Met the Definition of an Approved Pretreatment Program"

House of Raeford contends that the Government failed to prove that the City's pretreatment program met the definition of an "approved pretreatment program," in two ways. First, House of Raeford contends that the City's pretreatment program was not part of North Carolina's "federally approved" NPDES program. The Court addressed, and denied, this argument in Section I, above, with regard to House of Raeford's Motion to Arrest Judgment, and need not reiterate its analysis here. Second, House of Raeford contends that the Government failed to prove that the City's pretreatment program "met the requirements of an approved pretreatment program under federal regulations" during the period of time alleged in the Indictment.[6] Specifically, House of Raeford contends that the evidence presented at trial,

_____

[6] As discussed above with regard to House of Raeford's Motion for New Trial, an "approved pretreatment program" is defined as a program administered by a publicly-owned

namely correspondence between the State of North Carolina and the City, shows that the City failed to timely submit certain required information to North Carolina, including a headworks analysis and a sewer map, and failed consistently to identify and control the influent into the City POTW. House of Raeford further contends that, based on the City's purported failures, North Carolina considered the City to be "noncompliant," and the Government presented no evidence that the City returned to compliance during the Indictment period.

In response, the Government contends that a reasonable juror could find, based on the evidence presented at trial, that the City's pretreatment program met the criteria established by federal regulation. In support of its contention, the Government cites to a letter from the State of North Carolina approving the City's pretreatment program in 1983. (Govt.'s Trial Ex. 71) The letter states as follows: "The City of Raeford has successfully complied with the required activities cited at the State and Federal General Pretreatment Regulations 15 NCAC 2H .0900 and 40 CFR 403 respectively. . . . As a result, the Pretreatment Program of Raeford is approved as of June 10, 1983." (Govt.'s Trial Ex. 71). In addition, the Government cites to the trial testimony of Deborah Gore, current Supervisor of the Pretreatment, Emergency Response, Collection Systems Unit in the Division of Water Quality of the North Carolina Department of Environment and Natural Resources ("DENR"). Ms. Gore testified that North Carolina issued the pretreatment program approval letter found in Government's Trial Exhibit 71 and that North Carolina has never revoked the City's Pretreatment Program. (Trial Transcript Vol.

---

treatment works that meets the criteria established by regulation and that has been approved by the United States Environmental Protection Agency or by a state.

1, 39:5-13, [Doc. #72]).

Considering the contentions of both parties, the Court finds that the evidence cited by the Government, that is, the letter approving the City's pretreatment program and Ms. Gore's testimony, was adequate and sufficient to permit a reasonable juror to find, beyond a reasonable doubt, that the City's pretreatment program met the criteria of the federal regulations. As noted above, North Carolina granted the City approval of its pretreatment program only after such time as the City demonstrated compliance with the federal regulations. Furthermore, the text of the approval letter indicates that North Carolina would retain authority to make changes to the pretreatment program and would enforce the pretreatment program through the City's NPDES permit. (Govt.'s Trial Ex. 71). The City's NPDES permit requires the City's ongoing compliance with the federal regulations, stating "[t]he permittee shall operate its approved pretreatment program in accordance with . . . the Federal Regulations 40 CFR 403." (House of Raeford Trial Ex. 30, at 13). Therefore, from the evidence that North Carolina approved the City's pretreatment program only after initial compliance with the federal regulations, and that North Carolina, retaining powers to review and enforce the City's ongoing compliance with those regulations, never revoked the pretreatment program for any reason, a reasonable juror could find, beyond a reasonable doubt, that the City met the criteria established in the federal regulations during the period of the Indictment.

Moreover, the correspondence cited by House of Raeford does not make such a finding by the jury unreasonable. House of Raeford cites to six (6) letters between the City and the State of North Carolina spanning from May, 2005, to June, 2006. In the letters dated May 12,

2005, and August 19, 2005, the State of North Carolina is merely asking the City for more information so that the State can complete its compliance review. (House of Raeford Trial Exs. 1 & 2). In the letters dated June 23, 2005, and June 23, 2006, the State of North Carolina indicates that the City's modifications of the Significant Industrial User Permits, including House of Raeford's permit, are "adequate." (House of Raeford Trial Exs. 5 & 6). These four letters do not state that the City's pretreatment program is out of compliance with any federal regulations or other provisions under the law.

Further, in a letter dated December 16, 2005, the City, writing to the State of North Carolina, addresses concerns that the State had raised in a November 2, 2005 letter[7] regarding the need for a headworks analysis. (House of Raeford Trial Ex. 3). The City's December 16, 2005, letter does not indicate, however, that the State, in its November 2, 2005, letter found the City to be out of compliance with the federal regulations. Finally, in a letter dated February 23, 2006, the State of North Carolina indicates that the City's sewer map submission, as requested by the State, was inadequate and without sufficient detail. The letter further states that "[t]herefore, the City of Raeford is still considered to be Noncompliant *with the requirements of the Division's November 2, 2005 correspondence for a late submission*." (House of Raeford Trial Ex. 4 (emphasis added)). Like the December 16, 2005, letter, the February 23, 2006, letter also does not state that the City was "noncompliant" with any particular federal regulations. Furthermore, the February 23, 2006, letter does not indicate that the State of North Carolina was revoking the

---

[7] The November 2, 2005, letter was not entered into evidence by either party. As such, its express contents are unknown and, therefore, outside the scope of the evidence presented in this case.

City's pretreatment program or otherwise taking action with respect to that program. Therefore, although House of Raeford would have preferred that the jury infer from these letters that the City's pretreatment program failed to meet the criteria under the federal regulations, the jury, by its verdict, found that City's pretreatment program did comply with the federal regulations, and the Court concludes that the evidence presented at trial was adequate and sufficient to permit such a finding.

B. "The Government Failed to Prove That the City's Pretreatment Program Unambiguously Prohibited the Discharges Alleged in Counts Three, Six, and Eight Through Fourteen of the Indictment"

House of Raeford next contends that the Government failed to prove that the City's pretreatment program unambiguously prohibited the discharges alleged in Counts 3, 6, and 8-14.[8] In making this contention, House of Raeford first argues that the Consent Order did not unambiguously prohibit overflows before September 30, 2006, as a matter of law. The Court notes that House of Raeford raised this same argument in its Motion to Dismiss, which the Court previously denied, and the Court finds no basis to reconsider that matter here. House of Raeford also contends, as a matter of fact, that "there is no evidence by which a reasonable juror could conclude that House of Raeford believed that 'discharges of untreated wastewater' via bypasses and overflows were prohibited before September 2006." (House of Raeford Br.

_____

[8] House of Raeford's contentions in this section relate to the Consent Order. House of Raeford likely excludes Count 1 from its analysis because the underlying conduct in Count 1 occurred on February 7, 2005, before the effective date of the Consent Order, that is, May 12, 2005. For the same reason, Count 3 also should be excluded from House of Raeford's analysis, as the underlying conduct in Count 3 occurred on March 28, 2005, before the effective date of the Consent Order. However, because the Court finds House of Raeford's arguments unpersuasive as to any Count, the Court need not address this matter further.

22

at 15, [Doc. #78]).  Much of House of Raeford's briefing on this factual argument appears to hinge on its incorrect assumption that the Government was required to prove, as an element of the charged offenses, that House of Raeford "knew the discharge violated a requirement of the approved pretreatment program and did not mistakenly believe the discharge was permitted."  As discussed above with regard to House of Raeford's Motion for New Trial, however, the Government was not required to prove that House of Raeford knew it was violating a requirement of the approved pretreatment program.  Therefore, to the extent that House of Raeford challenges the sufficiency of the evidence based on its incorrect assumption regarding the elements of the charged offenses, the Court will deny the Motion for Judgment of Acquittal.

However, to the extent that House of Raeford is challenging the sufficiency of the evidence on other grounds, the Court will address the evidence presented at trial relating to the Consent Order.  House of Raeford generally contends that the Government failed to prove that, in light of the Consent Order, the City's pretreatment program prohibited the discharges of untreated wastewater as alleged in the Indictment.  Specifically, House of Raeford contends that, based on its "plain language," the Consent Order expressly provided that House of Raeford would have until September 30, 2006, to eliminate the discharges of untreated wastewater at issue in this case.  (House of Raeford Br. at 12, [Doc. #78]).  In support of its position, House of Raeford cites to Section II(B)(6) of the Consent Order which states, in relevant part, that "[o]n or before September 30th, 2006, the House of Raeford shall permanently eliminate all discharges of untreated wastewater from bypasses, spills, and overflows (including but not

limited to eliminating Bypass #1 and Bypass #2) and achieve compliance with IUP #5161 and the Sewer Use Ordinance." (House of Raeford Trial Ex. 19). Based on this language, House of Raeford contends that the Government failed to prove that the Consent Order meant anything other than "what is said," that is, that House of Raeford must eliminate discharges of untreated wastewater by September 2006, and not earlier.

The Government, in response, cites to Section II(A) of the Consent Order which states that "[d]uring the effective period of this Consent Order, [House of Raeford agrees to] meet and comply with all terms and conditions of IUP #5161 and the [Sewer Use Ordinance], except those interim effluent limits and monitoring requirements as specified below." (House of Raeford Trial Ex. 19). The Government contends that because House of Raeford's Permit (IUP #5161) contains a bypass provision prohibiting the discharge of untreated wastewater, and because the Consent Order required that House of Raeford comply with "all terms and conditions" of the Permit, except those expressly stated in Section II(A), the Consent Order, like the Permit, prohibited discharges of untreated wastewater. Furthermore, the Government contends that Section II(B) relates only to the construction of House of Raeford's new pretreatment facilities, that Section II(B)(6) sets forth a final deadline for that construction project, and that Section II(B)(6) does not negate the requirement stated in Section II(A) that House of Raeford comply with all terms and conditions of its Permit, including the bypass provision. Therefore, the Government contends that, based on all of the evidence, a reasonable juror could find that the pretreatment program, including the Consent Order, prohibited the discharges of untreated wastewater, as charged in the Indictment. House of Raeford, in

contrast, contends that Sections II(A) and II(B)(6) create, at least, an ambiguity regarding what conduct may be prohibited, arguing that "[a] reasonable juror could not rely on the general statement about compliance with the Permit in section II(A), while disregarding the specific language in section II(B)(6) that directly addresses 'discharges of untreated wastewater' via overflows and requires compliance with the Permit by September 2006." (House of Raeford Br. at 10, [Doc. #78]). As such, House of Raeford contends that "no reasonable juror could have found the Consent Order to unambiguously prohibit bypasses and overflows before September 2006." (House of Raeford Br. at 10, [Doc. #78] (emphasis omitted)).

Looking first to the "plain language" of the Consent Order, as is urged by House of Raeford, Section II(A) of the Consent Order expressly requires that House of Raeford comply with "all terms and conditions" of its Permit and the Sewer Use Ordinance ("SUO"), except the interim effluent limits and monitoring requirements set forth in Section II(A) of the Consent Order. Based on this "plain language," the parties to the Consent Order clearly contemplated that certain exceptions should apply to the general requirement in Section II(A) that House of Raeford comply with all terms and conditions of the Permit. The Consent Order expressly delineates those exceptions in the form of changes to the interim effluent limits and monitoring requirements. The Consent Order does not, however, set forth any exception regarding the bypass provision in Section II(A). Furthermore, as discussed in more detail below, Section II(B) does not create a separate exception to the general requirement stated in Section II(A). Rather, pursuant to the "plain language" of the Consent Order, the only exceptions to the general requirement are listed in Section II(A), and, if not listed there, the general requirement of

compliance applies.  Since there can be no dispute that both the Permit and the SUO, by their terms and conditions, prohibit the discharge of wastewater by way of the bypass provision, the Consent Order, by its plain language, prohibits the same.

To the extent that House of Raeford contends that "a reasonable juror could not rely on the general statement about compliance with the Permit in Section II(A), while disregarding the specific language in section II(B)(6)," the Court finds no reason to suspect that a reasonable juror would parse the Consent Order in the manner described by House of Raeford.  The two provisions in Section II(A) and Section II(B)(6) are not inconsistent with one another, and can be read in conjunction to support the jury's ultimate finding that House of Raeford violated a requirement of the pretreatment program in this case.  As noted above, Section II(B) does not create an exception to the general compliance requirement set forth in Section II(A).  In other words, Section II(B), by its terms, does not excuse House of Raeford from complying with all terms and conditions of the Permit and SUO during the period of the Consent Order.  Rather, in addition to meeting the general requirement under Section II(A), the Consent Order, through Section II(B), requires House of Raeford to undertake certain *additional* "activities" within a particular timeframe.  A plain reading of Section II(B) shows that these "activities" related to the construction of the House of Raeford facilities as a means of permanently eliminating bypasses, spills, and overflows.  Section II(B)(6) sets forth the final deadline for implementing the permanent changes going forward, but, again, does not excuse House of Raeford from interim compliance with the terms and conditions of the Permit and SUO.  As Judge Schroeder stated in his Memorandum Opinion and Order denying House of Raeford's original Motion to

Dismiss,[9] "[n]owhere does the Consent Order authorize bypasses at House of Raeford during the timeframe of construction contemplated in the Consent Order, but rather, "[r]ead as a whole, the Consent Order merely provides a deadline for House of Raeford to remove the bypass equipment and complete construction of a system to eliminate future bypass discharges." (Memorandum Order and Opinion, at 16-17, [Doc. #66, case number 1:09CR395-1]). Therefore, the Court concludes that the Consent Order itself provides sufficient evidence from which a reasonable juror could find that the pretreatment program, as a whole, unambiguously prohibited the conduct at issue in this case, that is, discharges of untreated wastewater in violation of the bypass provision.[10]

---

[9] As noted in the Court's Memorandum Opinion and Order [Doc. #55] denying House of Raeford's Motion to Dismiss in the present case, House of Raeford was previously charged in a Superseding Indictment in case number 1:09CR395-1. However, by Order dated February 29, 2012, this Court dismissed without prejudice the Superseding Indictment in that case due to a violation of the Speedy Trial Act. Thereafter, the Government filed the present Indictment. The Court adopted and incorporated by reference Judge Schroeder's Memorandum Opinion and Order denying House of Raeford's Motion to Dismiss in case number 1:09CR395-1, and refers to it again herein.

[10] The "bypass provision" in House of Raeford's Permit prohibits bypass "except when approved in advance by the City." (Govt.'s Trial Ex. 22). However, "[b]ypass approval shall be given *only* when such bypass is in compliance with 40 C.F.R. 403.17." (Govt.'s Trial Ex. 22 (emphasis added)). Therefore, to the extent that House of Raeford contends that the Consent Order acted as the City's prior approval of "bypasses," such approval would be allowed under the Permit *only if* the bypasses complied with 40 C.F.R. § 403.17. Pursuant to 40 C.F.R. § 403.17, the Control Authority, in this case the City, "may approve an anticipated bypass, after considering its adverse effects," if the City determines that it will meet three conditions as follows: "(1) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage; (2) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance;

Moreover, the Government presented sufficient other evidence during the course of trial from which a reasonable juror could find that the pretreatment program as a whole prohibited the conduct at issue in this case. For example, Richard Douglas, city manager for the City of Raeford in 2005, testified as follows:

> Government: To your knowledge, did this consent order grant any permission to the House of Raeford to commit unauthorized bypasses?"
> Richard Douglas: Absolutely not.
> Government: Why do you say that, Sir?
> Richard Douglas: I don't know why we would even remotely encourage that type of activity during this. The goal was to get these facilities put in place, but I don't know why we would hurt our – hurt the City's facility while you're doing one of these SOCs or consent order – special order by consent."

(Trial Transcript Vol. 3, 161:5-7; 161:13-19, [Doc. #74]). In addition, Stan Green, who previously worked as an attorney for the City, and who assisted in drafting the Consent Order, testified that the Consent Order deadlines dealt with the construction project only, stating that "[c]onsent orders are to . . . improve a plant. . . . you can't get a consent order for operator stuff." (Trial Transcript Vol. 3, 206:16-24, [Doc. #74]). Based on the testimony of these two witnesses, a reasonable juror could find that Section II(B)(6) related only to the construction project and that the Consent Order prohibited discharges of untreated wastewater in violation of the bypass provision, as set forth in Section II(A) of the Consent Order.

_____

*and* (3) The Industrial User submitted notices as required under paragraph (c) of this section." 40 C.F.R. § 403.17(d)(1) (emphasis added). The Consent Order in this case does not indicate that the three criteria for approval of bypasses were contemplated and/or met by House of Raeford at any time. Therefore, pursuant to the Permit and the incorporated federal regulations, the Consent Order, as written, could not properly serve as the City's prior approval of the bypasses alleged in this case.

House of Raeford contends that the City's view of the Consent Order, as set forth in the testimony of Mr. Douglas, Mr. Green, and others, is irrelevant, and that other evidence, including testimony by House of Raeford's engineering consultant Robert DeRosa and a letter sent to the City by Gregory Steenblock should govern.  However, even considering the evidence cited by House of Raeford, a reasonable juror could find that the Consent Order prohibited the conduct alleged in the Indictment.  With regard to Mr. DeRosa, House of Raeford contends that "Mr. DeRosa testified that, in 2005, he read the compliance schedule of the Consent Order to mean what it said.  He understood the Consent Order to give House of Raeford time to comply, to stop overflows."  (House of Raeford Br. at 12, [Doc. #78]).  However, House of Raeford overstates Mr. DeRosa's testimony.  During the cross examination of Mr. DeRosa, Mr. Darrell Fruth, on behalf of House of Raeford, addressed each activity required under Section II(B) of the Consent Order, including the submission of an engineering report and the start of construction on House of Raeford's facilities.  Mr. Fruth then questioned Mr. DeRosa about the deadlines in Section II(B)(6) as follows:

> Mr. Fruth: You understood this language [in Section II(B)(6)] to mean basically what it says, right?
> Mr. DeRosa: Yes.
> Mr. Fruth: That the consent order gave House of Raeford time to *fix* the overflows.
> Mr. DeRosa: Yes.

(Trial Transcript, Vol. 2, 51:17-22, [Doc. #73] (emphasis added)).  Viewing Mr. DeRosa's testimony in the context of the previous discussion with Mr. Fruth about construction, and in light of the other evidence, a reasonable juror could find that Mr. DeRosa's acknowledgment that the Consent Order provided time to "fix" overflows, related to his understanding that the

Consent Order provided a construction timeline in which House of Raeford was required to repair the physical problems with the pretreatment facilities related to overflows. Moreover, Mr. DeRosa did not testify that he understood the Consent Order to permit discharges of untreated wastewater in violation of the bypass provision.

With regard to the letter sent from Gregory Steenblock to the City on September 11, 2006, House of Raeford contends that the letter shows that the September 30, 2006, deadline in Section II(B)(6) related to the elimination of discharges of untreated wastewater separate and apart from the construction deadlines elsewhere in the Consent Order. However, contrary to House of Raeford's contentions, the letter makes no reference to discharges of untreated wastewater, but rather certifies only that House of Raeford completed construction on its facilities. The letter states as follows: "This letter is to confirm compliance, that House of Raeford has completed construction of their pretreatment facility improvements to include, removal of all bypasses, elimination of spills, and overflows." (House of Raeford Trial Ex. 23). Based on the language used by Mr. Steenblock in his own letter, a reasonable juror could find that Mr. Steenblock was acknowledging the construction deadline under the Consent Order, which is consistent with the other evidence presented at trial. Therefore, the Court concludes that the evidence presented in this case was sufficient to permit a reasonable juror to find that the pretreatment program prohibited the discharges of untreated wastewater, as charged in the Indictment.

C.    "The Government Failed to Prove Discharges of Untreated Wastewater"

House of Raeford next contends that the Government failed to prove that, to the extent

that wastewater was discharged to the City POTW, such wastewater was "untreated" as alleged in the Indictment. In support of its argument, House of Raeford contends that the pretreatment program does not define "untreated wastewater," but that House of Raeford's Permit delineates multiple steps of "treatment," which occur prior to any wastewater reaching the Flow Equalization Basin ("FEB"). Such "treatment" includes rotary screens, aerated equalization, and grit removal. Therefore, House of Raeford contends that wastewater that has gone through at least these stages of "treatment" prior to reaching the FEB cannot be considered "untreated." In making its argument, House of Raeford acknowledges that Trudy McVicker testified that she used the phrase "untreated wastewater" within the Notices of Violation to describe discharged wastewater that had not been sent through the DAF units, which is the final stage of pretreatment under the Permit. However, House of Raeford contends that the City's characterization of discharges of "untreated wastewater" in the Notices of Violation is not evidence that the wastewater was discharged "without treatment," since, per the Permit, the wastewater would have gone through several stages of treatment before reaching the City. (House of Raeford's Br. at 16, [Doc. #78]). Moreover, House of Raeford contends that the evidence presented in this case shows that on several of the dates charged in the Indictment, the water did receive chemical treatment in the DAF units prior to reaching the City POTW and, therefore, falls outside even the City's definition of "untreated wastewater."

In considering House of Raeford's argument, the Court notes that House of Raeford is correct that "untreated wastewater" is not expressly defined by the pretreatment program. However, the evidence presented in this case shows that House of Raeford had notice that the

discharge of "untreated wastewater," as alleged in the Indictment, did not mean the discharge of wastewater that had received no treatment whatsoever. As noted above, House of Raeford received several Notices of Violation for the discharge of "untreated wastewater." Trudy McVicker testified that she used the words "untreated wastewater" within the Notices of Violation to mean that the discharged wastewater had not been sent to the DAF units, or had been sent to the DAF units but was not properly treated therein.[11] (Trial Transcript Vol. 2, 119:20-23; 131:18-23, [Doc. #73]). In conjunction with Ms. McVicker's testimony, many of the Notices of Violation expressly state that the "untreated wastewater" was discharged from the FEB or from the DAF tanks following improper treatment. (See, e.g., Govt.'s Trial Exs. 35, 39, 40, & 42). Moreover, not only was the phrase "untreated wastewater" used repeatedly by Ms. McVicker, and others, in the Notices of Violation sent by the City, but that phrase was also used in the Consent Order, which representatives from House of Raeford signed, to describe the wastewater that reached the City by spills, overflows, and bypasses. As such, to the extent that

---

[11] House of Raeford contends that, at a minimum, a reasonable juror could not find that wastewater that was discharged from the DAF units was "untreated," since the DAF units represented the end of the pretreatment process. However, based on Mr. DeRosa's testimony in this case, proper treatment at the DAF units included adding polymers, which would bind to the solids in the wastewater, and air bubbles, which would cause the solids to rise to the top of the DAF tanks. Thereafter, the pretreatment process required House of Raeford to skim the solids and the polymers off the top of the DAF tanks. (Trial Transcript Vol. 2, 28:5-17, [Doc. #73]). To the extent that the evidence shows that wastewater was discharged after initially being pumped into the DAF tanks, particularly in Counts 9 and 12, the evidence further shows that although polymers were added, the solids were not effectively pushed to the top and scraped from the DAF tanks. Rather, the evidence shows that wastewater discharged to the City after being sent to the DAF tanks included the polymers and the solids that were supposed to be removed prior to sending the water to the City. Based on this evidence, a reasonable juror could find that the wastewater discharged to the City in Counts 9 and 12, as well as all other Counts of conviction, was "untreated" based on the definition presented at trial.

Ms. McVicker provided a definition for "untreated wastewater," that definition was supported by the other evidence in the case[12] to mean that wastewater had either not gone to the DAF tanks or had been improperly treated at the DAF tanks, and House of Raeford was on notice as to this meaning of "untreated wastewater." Therefore, the Court concludes that the evidence presented was sufficient to permit a reasonable juror to find that the that House of Raeford discharged "untreated" wastewater, as alleged in the Indictment.

D.    "The Government Failed to Prove 'Intentional' Diversions with Intent to Benefit the Company"

House of Raeford next contends that the Government failed to prove that the discharges of untreated wastewater alleged in the Indictment were "bypasses" as that term is defined in the pretreatment program, that is, the "[t]he intentional diversion of wastestreams from any portion of a user's treatment facility." (Sewer Use Ordinance, Govt.'s Trial Ex. 76). House of Raeford further contends that the Government failed to prove that House of Raeford employees acted with the intent to benefit the company. More specifically, House of Raeford contends that the Government failed to present any evidence that the chiller operators knew that opening the chiller valves wide and letting water flow out of the chiller tanks was in fact causing overflows in the FEB. In addition, House of Raeford contends that the Government presented no

_____

[12] Mr. Don Gruver, the former maintenance director at House of Raeford, also testified that "[i]f [wastewater] didn't go through the DAF, it wasn't treated." (Trial Transcript Vol. 3, 40:11-13, [Doc. #74]). Mr. Gruver further testified that wastewater that flowed directly from the FEB to the City was "untreated water from us going to them. It has not gotten any of our polymers." (Trial Transcript Vol. 3, 56:18-22, [Doc. #74]). In addition, Mr. Henderson, who worked in the sanitation department, testified that "the water wouldn't be treated if it goes to an overflow." (Trial Transcript Vol. 1, 132:23-24, [Doc. #72]).

evidence that any of the chiller operators, or anyone else at House of Raeford, intentionally diverted water from the FEB to the City. Furthermore, House of Raeford contends that the chiller operators were repeatedly instructed not to open the chiller valves too wide, that House of Raeford had policies in place indicating the same, and that wastewater operators often took it upon themselves to close the chiller valves when they saw the FEB overflowing. As such, House of Raeford contends that the evidence, at best, shows only negligent conduct by employees of House of Raeford, by potentially failing to take certain steps to prevent overflows in the FEB. Furthermore, House of Raeford contends that, to the extent that the conduct of the chiller operators contributed to or caused the overflows, the evidence shows that such conduct was against the interest of House of Raeford and not for House of Raeford's benefit.

The Fourth Circuit has held that "a corporation is liable for the criminal acts of its employees and agents done within the scope of their employment with the intent to benefit the corporation. The appropriate 'scope of employment' of such an employee or agent has been defined to include all those aspects falling within the employee's or agent's general line of work, when they are motivated–at least in part–by an intent to benefit the corporate employer." United States v. Singh, 518 F.3d 236, 249 (4th Cir. 2008) (internal quotations and citations omitted). Furthermore, the fact that an employee's actions were illegal or somehow contrary to the corporate policy or instructions does not absolve the corporation of liability. United States v. Automated Med. Labs., 770 F.2d 399, 407 (4th Cir. 1985). In accordance with these principles, the Court instructed the jury as to what the Government must prove in order to find House of Raeford, the corporation, guilty, as follows:

A corporation, like an individual, may be found guilty of an offense. However, a corporation acts only through its agents and employees, that is, those officers, agents, employees, or other persons authorized or employed to act for it. Therefore, to sustain the charges set forth in the Indictment against Defendant House of Raeford Farms, Inc., the Government must prove for each count:

> First: That the offense charged was committed by an agent or employee of House of Raeford Farms, Inc.;
> Second: In committing the offense, the agent or employee intended, at least in part, to benefit House of Raeford Farms, Inc.; and
> Third: The acts committed by the agent or employee were committed within the authority or scope of their employment.

If an agent or an employee was acting within the authority or scope of his or her employment, Defendant House of Raeford Farms, Inc. is not relieved of its responsibility because the act was illegal, contrary to the instructions of House of Raeford Farms, Inc., or against its general policies. You may, however, consider the existence of House of Raeford Farms Inc.'s policies and instructions and the diligence of its efforts to enforce them in determining whether the agent or employee was acting with the intent to benefit House of Raeford Farms Inc. or within the scope his or her employment.

In the light most favorable to the Government, the following evidence was presented over the course of the trial in this case. During the time period relevant to the Indictment in this case, part of House of Raeford's turkey processing procedures included sending the turkeys through chiller tanks filled with cold water. (Trial Transcript Vol. 1, 65:6-15, [Doc. #72]). House of Raeford had multiple chiller tanks operating on a daily basis, containing a total of around 200,000 gallons of water. (Trial Transcript Vol. 1, 66:18-67:16, [Doc. #72]). At the end of the workday, also known as the "kill shift," all of the water was drained from the chiller tanks by opening the valves located on either end of the tanks. (Trial Transcript Vol. 1, 67:17-68:1, [Doc. #72]). The chiller valves did not open automatically at the end of a shift, but rather had to be opened intentionally by a chiller operator or other House of Raeford personnel. (Trial Transcript Vol. 1, 118:10-17, [Doc. #72]). When chiller operators opened the chiller valves,

the water was dumped to the Offal Room and then to the Flow Equalization Basin ("FEB"). (Trial Transcript Vol. 1, 69:23-71:12, [Doc. #72]). The chiller operators controlled the speed and capacity at which water was dumped from the chillers by varying how wide they opened the chiller valves. (Trial Transcript Vol. 1, 95:15-20, [Doc. #72]). House of Raeford employees Billy Daniels, Charles Monroe, and Anthony "Gizmo" McCallister, among others, testified that the overflow of untreated wastewater from the FEB tank to the City was often caused by the chiller operators' repeated action of opening the chiller valves too wide, thereby discharging too much water too quickly from the chiller room. (Trial Transcript Vol. 3, 81:17-25; 92:4-8; 106:19-24; 120:11-18; 120:25-121:6, [Doc. #74]).

In addition, witnesses testified that Gregory Steenblock, the plant manager, and Don Gruver, the former maintenance director, knew that the FEB could not hold the amount of water discharged from the chiller room to the FEB when the chiller operators opened the valves wide. (Trial Transcript Vol. 3, 19:8-14; 120:25-121:8, [Doc. #74]; Vol. 1, 76:16-19, [Doc. #72] ("[I]t was like putting 5 gallons of water in a 4-gallon bucket.")). Furthermore, Mr. Daniels testified that the chiller operators "knew better than to open [the valves] wide open" because wastewater operators would tell chiller operators to close the valves and slow the discharge of water when the FEB tank was already overflowing or was nearing the overflow point. (Trial Transcript Vol. 3, 122:20-123:3, [Doc. #74]). However, as Mr. Gruver informed the City on at least one occasion following a discharge of untreated wastewater, "House of Raeford had to kill turkeys," and, therefore, the discharges continued. (Govt.'s Trial Ex. 108; Trial Transcript Vol. 3, 25:17-26:7, [Doc. #74]).

The Court finds that the evidence presented throughout this case, viewed in the light most favorable to the Government, was sufficient to permit a reasonable juror to find that the discharges of untreated wastewater charged in Counts 1, 3, 6, and 8-14 were "bypasses" or "intentional diversions of wastewater."  The evidence shows that employees within House of Raeford, including the chiller operators, knew the consequences of opening the chiller valves too wide, that is, overflow at the FEB, but that such conducted repeatedly occurred at the House of Raeford plant.  In addition, the Court finds that in discharging or causing such discharges, House of Raeford agents or employees acted, at least in part, with the intent to benefit House of Raeford, specifically its interest in continuing to kill turkeys.  Although House of Raeford argues that the Government failed to prove that employees acted with the intent to benefit House of Raeford because House of Raeford had policies in place instructing against conduct that could result in an overflow, the Court notes that it instructed the jury about considering such policies.  Specifically, the Court instructed the jury that although House of Raeford would not necessarily be relieved of its responsibility because the act of any employee was illegal, contrary to the instructions of House of Raeford, or against its general policies, the jury could consider any such policies in reaching its decision regarding House of Raeford's liability as a corporation.  The Fourth Circuit has found that "[j]uries 'are presumed to follow their instructions.'"  United States v. Castillo-Pena, 674 F.3d 318, 322 (4th Cir. 2012) (quoting Richardson v. Marsh, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709, 95 L. Ed. 2d 176 (1987)).  Therefore, the Court presumes that the jury, in reaching its guilty verdict on Counts 1, 3, 6, and 8-14, took into account whatever policies House of Raeford may have had in place regarding

the operation of its plant. As such, taking everything into account, the Court concludes that the evidence was sufficient to permit a reasonable juror to find House of Raeford guilty of the conduct charged in Counts 1, 3, 6, and 8-14.[13]

E.    "The Government Failed to Prove That House of Raeford's Permit Prohibited the Conduct Charged in Counts Twelve and Thirteen"

House of Raeford next contends that the Government failed to prove that House of Raeford's Permit prohibited the conduct charged in Counts 12 and 13. Specifically, House of Raeford contends that the Permit in effect on the dates associated with Counts 12 and 13 (March 20, 2006, and March 28, 2006, respectively), as submitted at Government's Trial Exhibit 89, does not contain a bypass provision. In considering House of Raeford's contention, the

---

[13] Moreover, the fact that the jury did not find House of Raeford guilty on every Count alleged in the Indictment suggests that the jury properly distinguished the evidence discussed above, from which a reasonable juror could find knowing, voluntary, and intentional discharges of untreated wastewater, and the evidence discussed below, from which a reasonable juror could find the discharges of untreated wastewater were the result of mistake or accident. For example, several Government witnesses testified that, in addition to dumping the chillers too fast, other causes of FEB overflow included rainwater in the FEB and mechanical problems with the pumps or other equipment at the House of Raeford plant. A reasonable juror could find that overflows caused by rainwater or mechanical problems, as opposed to dumping chiller water at a rate of speed that knowingly exceeded the FEB capacity, were accidents or mistakes. With regard to the "not guilty" Counts 2, 4, 5, and 7, the evidence suggested that on the date associated with Count 2, the FEB overflowed after heavy rain fell and filled the FEB. With regard to Count 4, the evidence suggested that the FEB overflowed after excess water had flowed in from Plant 2, which was not a kill facility, and which the operators in Plant 1 believed was closed on the day in question. With regard to Count 5, the evidence suggested that there was an electrical problem within the House of Raeford plant that led to problems with the pumps. Finally, with regard to Count 7, the evidence suggested a problem with the chillers and a possible mechanical issue with one of the pumps. Based on this evidence, the split verdict suggests that the jury properly executed its duties pursuant to the Court's instructions regarding the Government's burden of proof as to all elements of the offenses in this case, and properly applied the definitions within the Court's instructions.

Court notes that Government's Trial Exhibit 89 includes part of a "Permit Modification" to House of Raeford's Industrial User Permit ("IUP"), effective from February 28, 2006, to June 15, 2006.[14]  Part I(B) of the Permit Modification sets forth the "IUP Modification History" between September 1, 1994, and February 15, 2006, stating the reason for and description of each modification made during that time period.  The last entry on the IUP Modification History list, dated February 15, 2006, states in full: "Amended IUP to include average daily flow limit of 1.0 mgd to become effective February 28, 2006."  (Govt.'s Trial Ex. 89).  Therefore, by its express language, the Permit Modification in effect on the dates charged in Counts 12 and 13 modified only the "average daily flow limit," and no other provisions of the Permit previously in effect.

The Permit previously in effect included, in Part II(7), the bypass provision at issue.  (Govt.'s Trial Ex. 23).  The document submitted into evidence at Government's Trial Exhibit 89 contains only the pages of Part I of the Permit Modification that refer to and explain the modification of the average daily flow limit effective February 28, 2006, and, therefore, does not include Part II, where the bypass provision would be found.  However, the second page of the Permit Modification included in Government's Trial Exhibit 89 makes reference to Parts II and III of the Permit, thereby showing that such Parts exist under the February 28, 2006, modification.  Moreover, at trial, Deborah Gore testified that the Permit Modification effective February 28, 2006, was essentially the same as other Permits, which also contain Parts II and

---

[14]  Although the February 28, 2006, Modification includes an expiration date of June 30, 2010, a subsequent Permit Modification was issued with an effective date of June 15, 2006.

III. (Trial Transcript Vol. 1, 49:10-19, [Doc. #72]).  As such, although House of Raeford is correct that the document submitted into evidence at Government's Trial Exhibit 89 does not contain the pages of the Permit setting forth the bypass provision, the Court concludes that Ms. Gore's testimony and the language of the Permit Modification itself provided sufficient evidence from which a reasonable juror could find that the Permit Modification effective February 28, 2006, did not modify or remove the bypass provision at issue from House of Raeford's Permit and, therefore, that the bypass provision remained in force during the time period associated with Counts 12 and 13.

      F.      <u>"The Government Failed to Prove 'Serious' Offenses, as Required to Justify Reprosecution after its Violation of the Speedy Trial Act"</u>

Lastly, House of Raeford contends that the Government failed to prove "serious" violations, as required to justify reprosecution after the Government's violation of the Speedy Trial Act.  House of Raeford raised this argument in its Motion to Dismiss, which the Court previously denied.  In its present Motion, House of Raeford bases its Speedy Trial Act argument on its contentions, as set forth above, that the Government failed to present sufficient evidence to support to guilty verdict on Counts 1, 3, 6, and 8-14.  Therefore, to the extent that the Court has found that the Government presented sufficient evidence to support the jury's verdict on each of the grounds asserted above, the Court will deny House of Raeford's Motion for Judgment of Acquittal based on the Speedy Trial argument.  In any event, House of Raeford's Speedy Trial argument is more appropriately raised as a part of any appeal of the final judgment in the present case.  See <u>United States v. Myers</u>, 666 F.3d 402, 406 (6th Cir. 2012) ("[B]ecause the dismissal of an indictment without prejudice is an unappealable interlocutory order, appeal

of the ultimate [disposition of] a subsequent indictment is the *only* method by which a defendant may seek this Court's review of such an order." (internal quotations and citation omitted)).

Based on the foregoing the Court concludes that the Government presented sufficient evidence from which the jury could find House of Raeford guilty, beyond a reasonable doubt, with respect to Counts 1, 3, 6, and 8-14. As such, the Court will deny House of Raeford's Motion for Judgment of Acquittal on all grounds asserted.

IV.     CONCLUSION

For the reasons set forth above, IT IS ORDERED that the Motion to Arrest Judgment [Doc. #69], Motion for New Trial [Doc. #68], and Motion for Judgment of Acquittal [Doc. #67] filed by Defendant House of Raeford Farms, Inc. are hereby DENIED.

This the 17th day of January, 2013.

United States District Judge